## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JASON BAINBRIDGE,** | : | **CIVIL ACTION NO. 3:21-CV-1895** |
| | : | |
| **Plaintiff** | : | **(Judge Neary)** |
| | : | |
| **v.** | : | |
| | : | |
| **PAMELA BONDI,**[1] **Attorney General,** | : | |
| **United States Department of Justice** | : | |
| | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

Jason Bainbridge, a former correctional counselor at the Federal

Correctional Institution in Schuylkill, Pennsylvania ("FCI-Schuylkill"), has alleged

five claims against the Attorney General of the United States ("BOP"): (1)

discrimination in violation of the Rehabilitation Act, as amended, 29 U.S.C. § 701 *et*

*seq.*, (2) failure to provide reasonable accommodations in violation of the

Rehabilitation Act, (3) unlawful interference in violation of the Rehabilitation Act,

(4) unlawful age discrimination in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 USC § 621 *et seq.*, and (5) unlawful retaliation in

violation of the Rehabilitation Act and/or the ADEA. (Doc. 1). Following the

completion of discovery, the BOP has moved for summary judgment on all claims.

(Doc. 19). The court will grant the BOP's motion.

---

[1] Pamela Bondi became the Attorney General of the United States on
February 5, 2025, during the pendency of this action. She is automatically
substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). FED. R.
CIV. P. 25(d).

## I. __Factual Background & Procedural History__[2]

Jason Bainbridge worked as a correctional counselor at FCI-Schuylkill for six

of his approximately twenty-two-year career at the BOP. (Doc. 20-1 ¶ 1). Among

other responsibilities, correctional counselors manage "day-to-day interactions with

inmates," conduct "one-on-one in group counseling sessions," respond to

emergencies concerning "unruly and combative inmates," and handle "basically

any law enforcement duties inside the institution." (Doc. 20-1, ECF 572-582

(hereinafter "Counselor Bainbridge EEO Transcript") 7:12-20). These interactions

can expose correctional counselors to stressful and dangerous incidents, such as

physical attacks and even hostage situations. (Doc. 20 ¶¶ 11-12). Correctional

counselors need to be able to appropriately respond to these events to adequately

perform their duties. (Id.)

In January 2020, problems with Counselor Bainbridge's work began to arise.

(Id. ¶ 39). Around that time, Counselor Bainbridge informed his first-line

supervisor, Executive Assistant and Camp Administrator Ryan Miller, he wished to

speak to the Warden, Scott Finley, regarding "stuff [he has] going on at home that is

---

[2] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. PA. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (See Docs. 20, 30-1). To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

probably going to cause [him] to use annual leave and sick leave." (Doc. 20-1, ECF 4-54 ("Counselor Bainbridge Dep.") at 37:16-20)). When the three men met, Counselor Bainbridge told them about his issues with his then-wife, which was causing Counselor Bainbridge to be unable to "think clearly" such that his "head's not in the game." (<u>Id.</u> 38:2-24). Counselor Bainbridge insisted these issues did not render him unable to perform his job. (<u>Id.</u> 38:22-24).

Yet performance issues soon followed. On January 21, 2020, two case managers expressed concern to Administrator Miller, saying they believed Counselor Bainbridge had expunged incident reports for two inmates without following the appropriate Disciplinary Hearing Officer ("DHO") review process.[3] (Doc. 20-1, ECF 206-227 ("Administrator Miller Decl.") at ¶ 22; Doc. 20-1, ECF 228-229 ("Jan. 22 Administrator Miller Memo"). The case managers also reported Counselor Bainbridge "frequently comes in late, leaves early, and sometimes disappears for several hours throughout the course of the day," (Doc. 20-1, ECF 482 ("Brill Memo")), and that Counselor Bainbridge's "daily demeanor seems suspicious." (Doc. 20-1, ECF 483 ("Ball Memo")). When Administrator Miller asked Counselor Bainbridge about the improper expungement, Counselor Bainbridge admitted his mistake, which resulted from being "overwhelmed that day." (Administrator Miller Decl. ¶¶ 25-26).

The same day the case managers expressed their concerns to Administrator Miller, Counselor Bainbridge emailed Administrator Miller telling him Counselor

---

[3] Counselor Bainbridge alleges no claims against these case managers.

Bainbridge's wife "took every dime from me and left me in a very rough spot" and, as a result, Counselor Bainbridge was "at [his] wits end." (Id. ¶ 32). This email raised a red flag such that Administrator Miller sent an Employee Assistance Program ("EAP") letter to Counselor Bainbridge two days later. (Id. ¶¶ 33, 38; Doc. 20-1, ECF 230-232 ("Administrator Miller EAP Letter") at 231). This letter emphasized that the EAP referral "does not imply fault in any way," "does not constitute a disciplinary action of any kind," and "participation in EAP services is entirely voluntary and is confidential [.]" (Administrator Miller EAP Letter at ECF 231-232).

While Counselor Bainbridge maintains the EAP letter "does not pertain to my job whatsoever and it had nothing to do with me–it didn't interfere with my job at all," (Counselor Bainbridge Dep. 15:11-15), the same day he wrote the "wits end" email to Administrator Miller, Counselor Bainbridge also sent a private email to his psychiatrist and social worker saying his mental and physical health issues have caused him to consider medical retirement because he "came to the conclusion that I may not be fit for my job anymore." (Doc 20-1, ECF 614-615). And the same day Administrator Miller sent Counselor Bainbridge the EAP letter, Counselor Bainbridge wrote Administrator Miller an email that he is "going to see [a] psychiatrist after work. My mind is not here. There is too much on my plate at the moment. I just seem to keep messing up, and [I] have to go talk to someone." (Administrator Miller Decl. ¶ 39; Doc. 20-1, ECF 85).

Administrator Miller forwarded Counselor Bainbridge's email to Midhat Akhter, an HR manager who, in consultation with Administrator Miller and Warden

Finley, decided to contact Dr. Sylvie I. Cohen, Chief of the Occupational Safety & Health Branch for further guidance. (Administrator Miller Decl. ¶¶ 40-42). Akhter forwarded Counselor Bainbridge's email to Dr. Cohen and noted Counselor Bainbridge "does not seem to be in the right state of mind to return to work and it may end up being a safety and security concern for himself and others." (Doc. 20-1, ECF 85). Dr. Cohen recommended Counselor Bainbridge be issued an eight-point letter[4] to investigate whether his psychological condition rendered him unable to perform the essential functions of his role or whether a Fitness for Duty Evaluation[5] was necessary. (Doc. 20-1, ECF 55-72 ("Cohen Decl.") ¶ 54). Dr. Cohen also recommend that Counselor Bainbridge be placed on a Temporary Job Modification ("TJM")[6] while the results of his medical evaluations were pending. (Cohen Decl. ¶ 55).

In early February 2020, Akhter met with Counselor Bainbridge and Administrator Miller and provided Counselor Bainbridge with an eight-point letter to give to his medical provider. (Doc. 20-1, ECF 292-310 ("Akhter Decl.") at ¶¶ 41-42;

---

[4] "An eight-point letter is a request for medical information and it typically contains eight questions, though can be more or less, that are asked regarding an employee's medical condition." (Doc. 20 ¶ 22).

[5] "When a Fitness for Duty Evaluation is determined to be necessary, it consists of two parts: a physical medical evaluation followed by a psychological evaluation when a psychological condition is in question." (Doc. 20 ¶ 33). Fitness for Duty Evaluations are conducted by outside medical providers, not BOP personnel. (Id. ¶ 35).

[6] As relevant here, the BOP uses TJMs "to temporarily assign an employee who the BOP is concerned may be unable to perform the essential functions of his position due to present information provided regarding the employee's medical (physical and psychological) status." (Doc. 20 ¶ 27).

Doc. 20-1, ECF 337-352 ("Eight-Point Letter")). Counselor Bainbridge was also placed on a 30-day TJM, whereby "he would perform phone monitoring tasks in a sedentary environment and would not be required to respond to emergencies." (Doc. 20 ¶ 100). While Counselor Bainbridge maintained his grade, step, and salary on the TJM, (Id. ¶ 99), he was upset because he believed his TJM placement would lead his coworkers to think he engaged in wrongdoing to warrant "this timeout." (Counselor Bainbridge Dep. 26:13-22). Shortly after being placed on the TJM, Counselor Bainbridge again reiterated to his psychiatrist his belief that "he still needs to proceed with medical retirement." (Doc. 20-1, ECF 632). Counselor Bainbridge took sick leave for much of the next two weeks. (Doc 20. ¶¶ 107-108). After he returned to work, Counselor Bainbridge wrote to his primary care provider that he has "been in bed dealing with depression" due to his marital issues. (Doc. 20-1, ECF 629). Because Dr. Cohen had yet to provider her medical opinion as to whether Counselor Bainbridge could return to his normal duties, Warden Finley extended Counselor Bainbridge's TJM for another 30 days. (Doc. 20 ¶¶ 124-125).

After evaluating the responses to the eight-point letter, Dr. Cohen sought further clarification from Counselor Bainbridge's doctors "regarding (1) the length of time Mr. Bainbridge would require work restrictions and (2) an estimated date as to when he could return to full, unrestricted job duties[.]" (Cohen Decl. ¶ 66). Akhter issued a follow-up eight-point letter regarding these queries to Counselor Bainbridge and his neurologist. (Doc. 20 ¶ 135). Dr. Cohen reviewed the neurologist's response and determined that further clarification was needed regarding Counselor Bainbridge's psychiatric issues. (Cohen Decl. ¶¶ 72-73). Thus,

Dr. Cohen recommended that Akhter issued yet another eight-point letter, this time to Counselor Bainbridge's psychiatrist. (Id. ¶ 73). While the BOP awaited the response to the latest follow-up letter, Counselor Bainbridge's TJM was extended for another 30 days, with mailroom duties substituted for phone monitoring. (Doc. 20 ¶ 145). From March to June 2020, Counselor Bainbridge's TJM was extended in 30-day increments while the BOP awaited further information on Counselor Bainbridge's medical status. (Id. ¶¶ 126, 146, 151).

During this period, Counselor Bainbridge requested leave without pay ("LWOP") on numerous occasions. The first two requests, which Warden Finley approved for a total of 80 hours, were in connection to Counselor Bainbridge's father's health issues, his marital issues, and medical conditions that prevented him from coming to work. (Doc. 20 at ¶¶ 159-161). Warden Finley denied Counselor Bainbridge's third request, to take an additional 40 hours of LWOP animated by similar issues Counselor Bainbridge was experiencing, because Counselor Bainbridge had utilized almost all of the 80 LWOP hours for which he previously had been approved and which were set to expire a few days after Counselor Bainbridge's third LWOP request. (Doc. 20-1, ECF 114-135 ("Finley Decl.") ¶¶ 80-82). Shortly after his 80 LWOP hours expired, Counselor Bainbridge requested 8 hours of LWOP to pick up his son, which Warden Finley again denied because Counselor Bainbridge had sick leave and annual leave available for use. (Id. ¶¶ 83-84).

On May 21, 2020, Counselor Bainbridge filed for disability retirement because his medical conditions rendered him unable to adequately perform his correctional

counselor duties. (Doc. 20 ¶ 166). By his own representations, Counselor

Bainbridge's health issues caused him to miss work and degraded his performance

when he was working. (Id. ¶ 167). Counselor Bainbridge acknowledged that he may

be putting others "in a potentially harmful situation" because he struggles to be

fully present and cannot swiftly react to the dangerous situations that arise at FCI-

Schuylkill. (Doc. 20-1, ECF 600). Between June 5, 2020, and July 20, 2020, Counselor

Bainbridge received approval for 240 Family and Medical Leave Act ("FMLA")

LWOP hours. (Finley Decl. ¶¶ 91-92, 98-99).

Counselor Bainbridge participated in two Fitness for Duty evaluations in the

summer of 2020. (Doc. 20 ¶ 182-184). The first examining doctor determined that

Counselor Bainbridge "was physically able to perform the correctional counselor

position and a BOP law enforcement position." (Id. ¶ 183). Counselor Bainbridge

also engaged in a psychological evaluation, which concluded that he was not

psychologically fit for duty because he was unable to remain mentally alert to

respond to emergencies and maintained that additional treatment would not

substantially improve Counselor Bainbridge's functional ability. (Id. ¶¶ 184, 192-

193).

Counselor Bainbridge submitted a formal request for accommodation on

September 10, 2020. (Doc. 20-1, ECF 263-264 ("Form 100A")). In his request,

Counselor Bainbridge acknowledged that he was "no longer able to fully perform

the essential duties of [his] position," requested permission to "take liberal leave

and/or breaks, utilizing leave without pay when necessary," wished to be excused

from responding to emergent situations and inmate disturbances, and sought

"reassignment to a vacant position at my same agency and commuting area, within my same pay grade/scale and tenure, for which I am qualified and medically able to perform." (Id.) On October 15, 2020, the Office of Personnel Management ("OPM") found Counselor Bainbridge to be disabled from his correctional counselor position due to medical issues. (Doc. 20-1, ECF 590-597).

Counselor Bainbridge contacted the Federal Bureau of Prison Equal Employment Opportunity Program ("EEO") on March 13, 2020. (Doc. 20 ¶ 202). He filed an EEO complaint on June 11, 2020, alleging age discrimination, failure to accommodate, disability, and retaliation by Warden Finley and Administrator Miller. (Doc. 20-1, ECF 734-753 ("EEO Complaint"). After the EEO process concluded, litigation before this court ensued.

## II.    **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is material if resolution of it "might affect the outcome of the suit under the governing law" and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Mall Chevrolet, Inc. v. General Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The court's duty is not "to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 242-43.

There are "two closely related methods for a movant to succeed at summary judgment." <u>Mall Chevrolet</u>, 99 F.4th at 630. "First, under the standard approach, the moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law." <u>Id.</u> (citing FED. R. CIV. P. 56(a)). "Second, under the <u>Celotex</u> approach, a moving party may instead demonstrate that the nonmoving party has not made 'a showing sufficient to establish the existence of an element essential to that party's case *on which that party will bear the burden of proof at trial.*'" <u>Id.</u> (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).

The nonmoving party can defeat a motion for summary judgment by producing evidence to establish a genuine issue of material fact. <u>Anderson</u>, 477 U.S. at 256. The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> The party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. Moreover, if the nonmovant's version of disputed facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

III.    **Discussion**

Counselor Bainbridge raises five claims in his complaint: (1) disability discrimination in violation of the Rehabilitation Act, as amended, 29 U.S.C. § 701 *et seq.*, (2) failure to provide reasonable accommodations in violation of the Rehabilitation Act, (3) interference in violation of the Rehabilitation Act, (4) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C § 621 *et seq.*, and (5) retaliation in violation of the Rehabilitation Act and/or the ADEA. (See Doc. 1). None survives summary judgment.

**A.  Disability Discrimination**

Courts analyze Rehabilitation Act claims under the framework established in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). See Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007). The initial burden lies with the employee asserting a discrimination claim under the Rehabilitation Act to make a prima facia showing: "(1) that he or she has a disability, (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job." Id. at 184-85 (quoting Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)). Courts engage in a two-part test to determine whether an employee is a qualified individual: (1) whether the individual satisfies "the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." and (2) whether the individual can "perform the essential functions of the position

held or desired, with or without reasonable accommodation." McNelis v. Pa. Power & Light Co., 867 F.3d 411, 415 (3d Cir. 2017) (quoting 29 C.F.R. Pt. 1630).

If the employee establishes his prima facie case, the burden then shifts to his employer to articulate a "legitimate, nondiscriminatory reason for the employment action." McDonnell Douglas, 411 U.S. at 802. If the employer can do so, it will have rebutted the prima facie case. Wishkin, 476 F.3d at 185 (citing Tex. Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254–55 (1981)). The burden shifts once more to the employee to demonstrate "that the employer's stated reason for the employment action, such as plaintiff's rejection or separation, was pretextual." Id. (citing McDonnell Douglas, 411 U.S. at 804). This requires the plaintiff to "cast[ ] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication . . . or . . . allow[ ] the factfinder to infer that discrimination was more likely then [*sic*] not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994). A plaintiff can survive a motion for summary judgment by either "(i) discrediting the employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Id. at 764.

The parties agree that Counselor Bainbridge has met the first and third elements of the prima facie case, and that Counselor Bainbridge was qualified for the correctional counselor position, so the court need only consider whether Counselor Bainbridge could perform the essential functions of the correctional

counselor position, with or without reasonable accommodations.[7] (See Doc. 25 at 14-15; Doc. 30 at 2-3; Doc. 35 at 16).

The parties dispute whether Counselor Bainbridge was otherwise qualified to perform the essential duties of this job as of February 4, 2020, the day he was first placed on a TJM. Counselor Bainbridge testified that he could perform his duties as of that date. (See Counselor Bainbridge Dep. 21:9-20). The BOP argues that, among other things, his January 21, 2020, note to his psychiatrist wherein Counselor Bainbridge considers pursuing medical retirement due to his numerous health issues means he could not perform his correctional counselor duties. (Doc 20-1, ECF 614-615). This is a quintessential dispute of material fact that cannot be decided on summary judgment, and therefore Counselor Bainbridge has made his prima facie case for purposes of this motion.

The burden now shifts to the BOP to articulate a "legitimate, nondiscriminatory reason for the employment action." McDonnell Douglas, 411 U.S. at 802. It has done so. The BOP contends that its decision to place Counselor

---

[7] Though the BOP conceded in its opening brief that Counselor Bainbridge "can meet the third element of a disability claim because he did not perform correctional counselor duties at the satellite camp following February 4, 2020," it backtracks on this concession in its reply brief. There, for the first time, the BOP contends that Counselor Bainbridge has failed to demonstrate that the BOP took an adverse action against him with respect to his disability discrimination claim. Because the BOP did not raise this contradictory argument in its opening brief, it is deemed waived for purposes of its summary judgment motion. United States v. Cruz, 757 F.3d 372, 387-88 (3d Cir. 2014) (deeming waived "arguments that were raised for the first time in the Reply Brief") (citing United States v. Pelullo, 399 F.3d 197, 222 (3d Cir. 2005), as amended (Mar. 8, 2005)).

Bainbridge on a TJM resulted from a series of problematic incidents: (1) reports from other employees that Counselor Bainbridge expunged two inmate incident reports without following the appropriate processes; (2) his January 21, 2020, email to Administrator Miller that he was at his "wits end" due to his marital issues; and (3) his January 23, 2020, email to Administrator Miller indicating that he struggled to be mentally present at work. (<u>See</u> Doc. 25 at 26-27). These incidents raised alarm to his supervisors, who placed Counselor Bainbridge on a TJM on the advice of the BOP psychiatrist and BOP counsel until they could determine whether Counselor Bainbridge, who himself called his workplace competency into question, was fit to continue serving as a correctional counselor. (<u>See</u> Cohen Decl. at ¶ 55; Akhter Decl. at ¶¶ 41-42). This justification is both legitimate and nondiscriminatory, and thus the BOP has met its burden.

Shifting the burden back to Counselor Bainbridge, he argues the BOP's justification was pretextual because it merely "restate[s] its argument that a TJM is not an adverse employment action." (Doc. 30 at 17). Even assuming that Counselor Bainbridge's placement on a TJM *was* an adverse employment action, the BOP has articulated a legitimate, non-discriminatory reason for doing so. Counselor Bainbridge has failed to demonstrate that the BOP's reasoning was pretextual, and thus the court grants summary judgment to the BOP for Counselor Bainbridge's disability discrimination claim.

## B.  Failure to Provide Reasonable Accommodations

Moving to Counselor Bainbridge's accommodation claim, our court of appeals has instructed that an employee must "demonstrate that a specific,

reasonable accommodation would have allowed her to perform the essential functions of her job." <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 320 (3d Cir. 1999). An employer is "not required to modify the essential functions of a job in order to accommodate an employee." <u>Donahue v. Consol. Rail Corp.</u>, 224 F.3d 226, 232 (3d Cir. 2000).

Likewise, a plaintiff alleging that he could have been reassigned to another role bears the burden of establishing "(1) that there was a vacant, funded position; (2) that the position was at or below the level of the plaintiff's former job; and (3) that the plaintiff was qualified to perform the essential duties of this job with reasonable accommodation." <u>Id.</u> at 230. These positions must already exist: an employer is "not required to create positions specifically for the handicapped employee." <u>Shiring</u>, 90 F.3d at 831. If the employee makes this showing, the burden shifts to the employer to "demonstrate that transferring the employee would cause unreasonable hardship." <u>Donahue</u>, 224 F.3d at 230.

Counselor Bainbridge's reasonable accommodation claim suffers from two fatal flaws. First, he never alleged any specific, reasonable accommodation that would have allowed him to adequately serve as a counselor at the prison. On September 10, 2020, Counselor Bainbridge filed a DOJ Form 100A Request for Reasonable Accommodation. (<u>See</u> Form 100A). In it, Counselor Bainbridge admits to being "unable to fully and safely perform my duties" as a result of his medical conditions, including the inability to respond to emergency situations that arise, and requests "to be excused from responding to inmate disturbances and

emergency situations and the ability to take liberal leave and/or breaks, utilizing Leave Without Pay when necessary." (Id.)

The problem for Counselor Bainbridge is that no reasonable juror could find such "accommodation" reasonable because it strips the counselor role of what Counselor Bainbridge himself admits are its essential duties—responding to crises that arise in the prison. (See Counselor Bainbridge EEO Transcript at 7:12-20; Counselor Bainbridge Dep. 13:10-12). To accommodate Counselor Bainbridge's request, the BOP would effectively need to modify the essential tasks it assigns to its counselors, which the law does not require. See Donahue, 224 F.3d at 232. Tellingly, Counselor Bainbridge observed in the Form 100A that his medical conditions have rendered him "no longer able to fully perform the essential duties" of his position. (See Form 100A).

Counselor Bainbridge's contention that he appropriately sought reassignment fares no better. In the Form 100A, Counselor Bainbridge noted that he would be "willing to consider offers of reassignment to a vacant position at my same agency and commuting area, within my same pay grade/scale and tenure, for which I am qualified and medically able to perform." (Id.). The recitation of these magic words cannot conjure up vacant, funded roles for which Counselor Bainbridge is qualified. He never proffers any specific position to which he could appropriately be reassigned. An amorphous request cannot suffice to meet Counselor Bainbridge's burden of demonstrating that an appropriate role exists, and no reasonable juror could find to the contrary. See Donahue, 224 F.3d at 230.

Counselor Bainbridge protests that the BOP did not engage in the interactive process to find a reasonable accommodation as required by law. Even if that is so,[8] Counselor Bainbridge cannot fault the BOP for purportedly failing to meet its burden when he has failed to meet his. No reasonable juror could find that Counselor Bainbridge's proposed accommodation was reasonable, nor has Counselor Bainbridge identified a specific role whose essential duties he could perform. As a result, summary judgment is granted to the BOP on the accommodation claim.

## C.  Rehabilitation Act Interference

The gravamen of Counselor Bainbridge's interference claim is that Warden Finley's denial of Counselor Bainbridge's leave requests interfered with Bainbridge's rights under the Rehabilitation Act. (Doc. 1 ¶¶ 75-79; Doc. 30 at 30).

Section 501 of the Rehabilitation Act incorporates "the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990." 29 U.S.C. § 794(d). Section 503 of the ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act." 42 U.S.C. § 12203(b).

---

[8] The BOP has admitted that no documentation exists demonstrating that it engaged in the interactive process with Counselor Bainbridge before February 4, 2020—the day Counselor Bainbridge was first placed on a TJM. (Doc. 30-2, ECF 273).

Caselaw on this statutory subsection is limited, particularly as to what constitutes unlawful interference. While the Third Circuit has yet to articulate the elements of a Section 12203 claim, this court has done so in Place v. Zoning Hearing Bd. of City of Nanticoke, 714 F. Supp. 3d 471, 482 (M.D. Pa. 2024). Place notes that other courts of appeal have interpreted Section 12203(b) the same way as they have interpreted Section 818 of the Fair Housing Act ("FHA"), 42 U.S.C. § 3617, which "employs identical language." Place, 714 F. Supp. 3d. at 482 (citing Brown v. City of Tucson, 336 F.3d 1181, 1191 (9th Cir. 2003); Frakes v. Peoria Sch. Dist. No. 150, 872 F.3d 545, 550 (7th Cir. 2017)). The prima facie case under the Section 12203(b), vis-a-vis Section 818 of the FHA, is thus: "(1) that the plaintiff exercised or enjoyed any right granted or protected by" Section 12203(b); "(2) that the defendant's conduct constituted interference; and (3) a causal connection existed between the exercise or enjoyment of the right and the defendant's conduct." Place, 714 F. Supp. 3d. at 482 (internal quotation marks removed) (quoting Revock v. Cowpet Bay West Condominium Assoc., 853 F.3d 96, 112–113 (3d Cir. 2017)).

Counselor Bainbridge's argument against summary judgment on this claim is devoid of citation to the record or reference to caselaw. (Doc. 30 at 30). He contends the BOP's denial of his LWOP and FMLA requests "amounts to interference with [Counselor Bainbridge's] exercise or attempted exercise of his rights under the Rehabilitation Act." (Id.). But he does not provide any support for the proposition that mere denial of LWOP or FMLA requests constitutes interference. And Counselor Bainbridge's argument is belied by the numerous LWOP and FMLA requests that the BOP did approve. (See, e.g., Finley Decl. ¶¶ 91-92, 98-99 (noting

that Counselor Bainbridge was approved for 240 FMLA LWOP hours between June 5, 2020, and July 20, 2020)). Therefore, the court grants judgment on this claim in the BOP's favor.

### D. Age Discrimination

Counselor Bainbridge maintains the BOP's decision to "remove [Counselor Bainbridge] from his position and replace him with significantly younger, less experienced, and less senior employees" amounts to unlawful age discrimination claim under the ADEA. (Doc. 1 ¶ 105).

As relevant here, the ADEA provides that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). As with Rehabilitation Act claims, ADEA claims apply the McDonnell Douglas framework. Wishkin, 476 F.3d at 185. To establish a prima facie case of age discrimination under the ADEA, a plaintiff must show: "(1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015). If an employee establishes a prima facie case, the employer bears the burden of articulating "a legitimate nondiscriminatory reason for the adverse employment action." Id. (quoting Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)). And if an employer meets this burden, "the burden shifts back

once more to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual." Id.

The Supreme Court has explained that Section 633a(a) liability attaches when "age discrimination plays a part in a federal employment decision," not merely when the plaintiff's age was the but-for cause of that employment decision. Babb v. Wilkie, 589 U.S. 399, 406 (2020). Put differently, "under § 633a(a), age must be the but-for cause of *differential treatment*, not that age must be a but-for cause of the *ultimate decision*. Id. at 408 (emphasis in original).

The BOP does not dispute that Counselor Bainbridge was at least 40 years old during the relevant period and that he was qualified for the correctional counselor position, but that is where the parties' agreement ends. (Doc. 25 at 19). The parties dispute whether Counselor Bainbridge was subject to an adverse employment decision, whether Counselor Bainbridge was replaced as correctional counselor, and whether age discrimination played a part in the BOP's employment decision. While the record arguably paints a murky picture on these elements, even if Counselor Bainbridge had met his prima facie case, the BOP has proffered a legitimate, non-discriminatory reason for replacing Counselor Bainbridge. The record demonstrates Counselor Bainbridge engaged in a pattern of concerning conduct. These incidents include: (1) coming to shifts late and leaving them early; (2) improperly expunging inmate incident reports; and (3) sending concerning emails to his supervisors about his wellbeing. (See, e.g., Brill Memo; Ball Memo; Administrator Miller Decl. at ¶¶ 22, 32). Counselor Bainbridge fails to demonstrate that the BOP's justification is pretextual—these incidents are well-documented in

the record, whereas any supposed scheme by the BOP to engage in illegal age discrimination is not. See Clark v. Geisinger Health Sys., 2025 WL 1839498, at *6 (M.D. Pa. July 3, 2025) ("bare denials and allegations are insufficient to defeat a motion for summary judgment.") (citing D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 268-69 (3d Cir. 2014)). And so, the court grants summary judgment on this claim, too.

### E. ADEA/Rehabilitation Act Retaliation

Counselor Bainbridge asserts retaliation claims under the Rehabilitation Act and the ADEA. Counselor Bainbridge contends that the BOP's investigations were a form of retaliation in response to his EEO actions. (Doc. 1 ¶¶ 142-43).

An employee asserting a retaliation claim under both the Rehabilitation Act and the ADEA must establish a prima facie case that (1) he was engaged in protected activity; (2) his employer engaged in an adverse employment action after or contemporaneously with the employee's protected activity; and (3) the adverse action was animated by his protected activity. Kondas v. Potter, 328 F. App'x 116, 120 (3d Cir. 2009) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)); Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002).

There is no dispute that Counselor Bainbridge's pursuit of EEO relief was a protected activity. (Doc. 25 at 23). The parties do dispute whether Counselor Bainbridge was subjected to an adverse employment action—the BOP investigations—on or after he began to seek such EEO relief, but even assuming he had, Counselor Bainbridge has failed to demonstrate that there is any causal connection between his EEO activity and the BOP investigations. Counselor

Bainbridge offers bare argument that he "has established causation based on temporal proximity and a pattern of antagonism." (Doc. 30 at 13). The record demonstrates that at least one of the investigations began *before* Counselor Bainbridge commenced his EEO activity, and he has not demonstrated any causal connection between the two later investigation referrals with the same EEO activity. (Doc. 20-1, ECF 480). Temporal proximity is not enough to establish causal connection—there must be more because, after all, the second element of the prima facie case already takes temporal proximity into account. But here, there is not, and so the court grants the BOP summary judgment on this claim.

This claim would meet the same fate even if Counselor Bainbridge established his prima facie case. Here, again, the BOP has proffered a legitimate, non-discriminatory reason for the adverse action (*i.e.*, engaging in these investigations): the BOP's understanding of Counselor Bainbridge's work performance (not his EEO activity) warranted it. Again, the BOP determined that Counselor Bainbridge was not present for at least part of some shifts, it was informed that Counselor Bainbridge improperly expunged inmate incident reports, and Counselor Bainbridge himself made a series of concerning statements about his mental health to his supervisors. (See, e.g., Brill Memo; Ball Memo; Administrator Miller Decl. at ¶¶ 22, 32).

**IV.**    **Conclusion**

There is no genuine dispute of material fact as to any of Counselor

Bainbridge's claims. Thus, the court grants summary judgment in the BOP's favor.

An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated:    July 11, 2025